We'll call our first case. This is Deon v. Barasch. And Mr. Hopkirk, I understand you'll be arguing from where you are. Are you mic'd up, sir? Yeah, can you hear me? I can hear you. Let me just make sure that Judge Nygaard, who's with us here remotely, can hear as well. Can you hear Mr. Hopkirk? I can hear him, yes. Okay, great. Mr. Hopkirk, you may proceed, sir. May it please the Court, my name is Howard Hopkirk. I am a Senior Deputy Attorney General with the Pennsylvania Office of Attorney General. I represent the appellants, Pennsylvania gaming officials. I would like to reserve three minutes for rebuttal. Done. Pennsylvania's prohibition on political contributions by individuals affiliated with the gaming industry is constitutional because, first, it serves the important government interests of preventing political corruption and the appearance of corruption. Okay, let's stop right there, Mr. Hopkirk. At the district court level, the district court politely, but I think emphatically, said, hey, the Commonwealth keeps arguing about stuff that nobody's disputing. The Commonwealth says what you just said right now. And Judge Rambo said everybody agrees that preventing corruption, the appearance of corruption, is a truly significant interest. But McCutcheon teaches us that the only sufficiently substantial government interest to meet the standards set in Buckley v. Filao is the prevention of quid pro quo corruption. Now, is the district court correct about that? That it's not enough for you to say we want to stop corruption, but you have to have the only interest you can have that's sufficient to warrant a restriction on political contribution and speech is quid pro quo corruption? Or the appearance of quid pro quo corruption. So we're on the same page about that. Yes, I think the interest of the government is pretty clear and self-evident. And in this case, and at the district court level, it seems that the real question is whether it's closely drawn to achieve that interest. Right. What's the relevance of the section title that this was cast in terms of political influence more broadly? Many of the cases you rely on from other states, like Soto, were in an era when they said, well, we want to prevent influence. But since then, the Supreme Court's made clear that merely limiting influence isn't enough. There has to be that direct quid pro quo. Well, I think, I mean, first of all, that's just the title. It would fall under that general category. Quid pro quo corruption falls within political influence. And I think this Soto and the Louisiana case, I mean, they're broader than just political influence. Supreme McCutcheon cases, though, right? They were decided before McCutcheon, weren't they? They were decided before that, but I don't think. Well, listen, isn't McCutcheon a pretty significant case? When the Supreme Court comes out and says, well, we don't really have to decide whether Buckley versus Faleo is right or wrong, and we don't have to decide whether we're under strict scrutiny or not. I took what the Supreme Court to be saying in McCutcheon was, hey, we got a two-pronged test out of Buckley that the language we use about a sufficiently important government interest is effectively the same as a compelling interest under strict scrutiny. And we don't have to decide whether narrow tailoring and closely drawn are synonymous because you, the McCutcheon folks, you know, the government's going to fail under the closely drawn test. So we don't have to decide that point. In short, McCutcheon seemed to be saying, among other things, that this closely drawn test is a serious matter. It's not an easy throwaway, and it looks an awful lot like narrow tailoring, and you're going to have to show something pretty close to quid pro quo corruption or concern about that. Am I wrong in my understanding of what McCutcheon's saying? So, I mean, McCutcheon had to do with aggregate limits on contributions, and so there was a disconnect between the idea that you'd have in an individual case some type of limit and that because you hit the aggregate, you could no longer give that limit. I mean, I think Pennsylvania, in this case, relying on the experience of other states has made clear that they are prohibiting across the board this type of giving. That's the whole point, right? That's the very problem that your adversaries are trying to get at and that we're hoping that you will grapple with, Mr. Hopkirk. Their assertion is there's not any support for the assertion that you are entitled to prohibit all contributions of any size from any person remotely touching the gaming industry, but within that broad scope of Section 1513 and call that closely drawn to meet the quid pro quo restriction that McCutcheon said was okay. Judge Rambo's example, a $1 contribution from somebody who might have one share of a Bollies casino stock that happens to have a license is somehow going to cause quid pro quo corruption. That's the kind of example she uses. How is that kind of prohibition closely drawn to meet the problem? I mean, this is a prophylactic measure. In individual cases, you can argue, and it might be true, that there is no quid pro quo corruption, but there still can be the appearance of corruption when you have... and has one share of Bollies stock. That's the threat or the concern or it raises the specter and the appearance of impropriety and corruption? Well, I mean, first of all, this only applies to... I mean, you have to be a principal. It's not like every employee of a casino is governed by this. How do you get to that? 1513, let's go into statute. What are you looking at in 1513 that says you have to be a principal? It says the following person shall be prohibited. And then when it gets into it, it says down here, a licensed principal or licensed employee is subsection A3, but A6 is a person who holds a gaming license or is an affiliate, an intermediate. There's also a discussion in here... were governed by the prohibition. All right, take Eppeli McGurkow, beneficiary of a trust. You've never argued here that she's not covered by this law. No, I mean, she's the sole beneficiary of this trust and which has benefits from the gaming industry. And I mean, the public could see contributions by someone like that as ending up favoring beneficiaries of the gaming industry. She makes a contribution to the register of wills in Philadelphia who has nothing to do with the gaming industry. This ban is not limited to the gaming control board or people with oversight over it. It applies across the state to all the elected offices. So we're talking about who cannot accept contributions when you're talking about the register of wills as opposed to the plaintiffs in this case. But she can't give, she can't make any contributions within this state. That's correct. That's not closely drawn. Well, the General Assembly, when you look at their intent, that that's what they're trying to do is to have across the board prohibition. Their intent doesn't help us much. It's what they said. Right. And what they said and your assertion that she's the sole beneficiary of this trust. You know, what if this the content of this trust includes one share of stock? I mean, she may be the sole beneficiary of the one share of stock, but she's still covered. Right. I believe you're right. I then then how can it be? We're having trouble understanding if the concern is the appearance of quid pro quo corruption, how something that attenuated, which Judge Rambo pointed out is very attenuated. Can pass the closely drawn test. I actually think that you have to. You know, just having one share of the stock wouldn't be enough. But I'm not saying you're incorrect, Your Honor. That's my recollection that she she was her trust made her the sole you know, she was the sole beneficiary. And what that trust did was own or operate or have an interest in owning and operating a casino and interest. If you can point us to something that tells us that an interest means a controlling interest or something like that, then that might be different. But an interest doesn't get you very far. And another problem is Judge Jordan's question about a dollar and Judge Rambo's is picking up on Buckley. Buckley said one of the reasons you can limit campaign contributions is people can still make symbolic contributions. Well, you've closed down that ability to make symbolic contributions of support. And it's hard to see how a dollar or one hundred dollars corrupt somebody. So Buckley itself seemed to suggest there was a big difference between a limit and a complete ban. But there's still other First Amendment avenues that these people have available to them, including independent expenditures. They take issue with you on that. Judge Rambo took you up on that footnote in which she pointed out a plain reading of the statute looks like independent expenditures are still covered. Why is she wrong? So I think if you read 1513 and then you look at the definitions of political committees and things like that that are subsumed within that and also are in accordance with the Pennsylvania Election Code, that those are not governing independent expenditures. Well, you know, she read it. We read it. Let's look at page 833 in the appendix and footnote seven in her opinion and help us out here. She parses this and says, Section 1513 prohibits contributions to any other political committee in this commonwealth or any group in support of a political committee in this commonwealth. And then political committee is defined as any committee, club, etc., which receives contributions or makes expenditures. Then her statement is a plain reading of the statute would include independent contributions. How is the arc of her reasoning incorrect? So in 1513, when it talks about political committees, it's within the context of charitable contributions in support of a candidate. How do we know that? From the first paragraph of 1113. Again, that's how we interpret it. And with all due respect to Judge Rambo, we disagree with her interpretation. Okay. All right. Judge Naggard, anything from you, sir? I have no questions. Thank you. All right. Thanks. Mr. Hopkirk, we'll have you back on rebuttal. And Mr. Hamlet. May it please the Court. Good morning. Our position, Your Honors, is simple. The judgment below should be affirmed because there is no way, in our view, that this statute can be enforced under existing law. And we recognize that the briefing and that the questioning that you've asked over the previous ten minutes or so has delved into some of the jurisprudence on the standard and the application and the statutory analysis that would be relevant to whether you could uphold the discriminatory abridgment of rights like this one. And I'm happy to provide our views, to provide feedback on some of the questions that you've asked, and, of course, to advocate our position. But in the end, we're not asking you to stretch the boundaries on any existing doctrine. The bottom line, as we see it, is that there is no enforcing this provision under any standard, and certainly not on this record in this history. Why don't you speak to the assertion from Mr. Hopkirk? This only covers principles. It doesn't cover the one stockholder or the beneficiary of a small truck. I think there's two different types of affected persons in your question, Your Honor. Let me break them down. Let me take them in reverse order, the beneficiary and then the one share of stock. On the beneficiary, I'm reading from what is page 7 of our brief, but it's in the statute, and I'm looking at section 1103 of the Gaming Act. And it defines a principal as anyone, a principal meaning someone who's going to be impacted by the contribution ban, as anyone who directly holds a beneficial interest in or the ownership of the securities of an applicant or a licensee. So beneficial interest would cover Ms. Hardy. So that's where that comes from. She owns a beneficial interest in the trust, and the trust is the operative device that carries her to the amit of the statute. And ownership of securities doesn't say you have to own all the securities or a majority or a controlling interest. I think that that's mostly correct. I believe that there are opinions that go into what does constitute a controlling interest. And at the moment, I am not positive that one share in stock would constitute a controlling interest. I know there's an opinion that covers something more than 9%, and we do discuss that in the brief, Your Honor. But in all candor, sitting here at this moment, I am not sure if something above 9% of the ownership would count. I might have to check on that. Sitting here today, I don't know. The language of the statute is ownership of the securities of an applicant. That's correct. That's correct. It's extremely broad. The bottom line, I think, to what you're getting at is it has an extremely broad reach. It's a wide ambit. It covers a large range of persons associated with the gaming industry. And that's why – I'm sorry. I'll go ahead and finish. Then I have a question for you. All right. If we were to agree with you, we have not written on this. What would our holding look like? In other words, what does closely drawn – what's a closely drawn restriction? The most important word in your holding, Your Honor, I would say should be the word affirmed. The – I do not think that you need to take a strong position on the standard of scrutiny. If we were to have our position, I believe and we believe that the proper standard is, in fact, strict scrutiny. And I'm not – I'm going to come to your question. If you'll bear with me for about 30 seconds, we'll get to the closely drawn answer. The reason why we believe it is strict scrutiny is because of the discriminatory impact of the statute on this discrete class of persons and also because, going to Judge Jordan's questions, that it does have this impact on the literal text of the statute, on the independent expenditures. As for closely drawn, though, as we read this court's precedent in the McNesby case, closely drawn means that there needs to be consideration of targeted alternatives. And in our view – in our view, the Commonwealth has already accomplished the targeted alternatives. So I don't know that in actual application of this statute there can be a closely drawn alternative. But what are the targeted alternatives that you believe are constitutional that are already in place? The Gaming Act itself. All the provisions and the background and the necessity of the integrity review of the persons who get the licenses under the Gaming Act. In fact, the best place to see this, Your Honor, is if we look at the amicus brief filed by Penn Gaming. They go through – we cover this in our brief as well, but Penn Gaming does a thorough job of explaining the background applications that are required to get this license. So if we accept the opening question, I believe, from Judge Jordan, the opening question was, well, what is it that goes into the statute that is targeting quid pro quo corruption? Sorry, I didn't mean to sidetrack you from answering Judge Nygaard's question. I get what you're driving at here. Okay. Well, actually, I do think it dovetails with the question nicely. And in some respects, if I can play a twist on Mark Antony, I'm not here to bury the statute. Right. I want to praise it because the statute does go after quid pro quo corruption, whether it's influence, which, as Your Honor has pointed out, is not enough, but also quid pro quo corruption. It goes after that, and it covers it thoroughly. In the district court record, it's docket 5150-1 in the district court. There's an appendix submitted by Penn Gaming that has well over 100 pages of the background application that these applicants must submit on their personal integrity. Ten years' worth of information on their integrity, on their campaign contributions, on their financial disclosures. So I'm closely drawn to Judge Nygaard's question on closely drawn scrutiny. The targeted alternative, see, where I think the law gets a little bit mixed up on closely drawn scrutiny, is it's presupposing that there has to be an abridgment of First Amendment rights. There doesn't. Targeted alternative means something else that the General Assembly can do to accomplish the objective, and they've done it here, and they've done it well. Does closely drawn, look, you've said you think strict scrutiny applies here. Is this just an on-off switch, or is it possible that a part of the statute, if it's true that it reaches independent expenditures, that that falls outside of Buckley and would acquire strict scrutiny, but that the rest of your challenge, to the extent it involves direct contributions, is under Buckley and therefore is not subject to strict scrutiny? I understand the question. Let me just absorb it for a second. I heard you ask a similar question a few minutes ago, and I think my instinct is to agree that the lines are not very clear between the two standards, and I think it would fail equally under either for the same reasons. If that's true, then why wouldn't we take the same approach that the Supreme Court took in McCutcheon and say, you know, we don't have to figure out whether this is strict scrutiny or not, because even under this modified intermediate scrutiny, it's a loser. I think that that is a perfectly good approach to take here. Were to agree with your characterization and disagree with Judge Ramos. I think that that would be, in fact, the pragmatic. Look, I don't want to suggest to the court that you ought to be writing a pragmatic decision. That's certainly your prerogative and not mine, but I could see the eminent sensibility in that, and that's why when I began today, I started with the premise that I'm not asking you to push any existing doctrine. I think the decision, Judge, that you just outlined would square on all fours with McCutcheon. I do think, consistent with your opening line of questions this morning, that that is the key precedent before us today. I think this court's decision in McNesby also teaches us a lot, because that seems to us to be a rather direct application of the same principles, but that's where I would go. Address, if you would, your opponent's arguments about the Soto case. It's true, McCutcheon came later, but the Supreme Court of New Jersey went into a lot of detail about why a ban on all contributions is an appropriate thing in the gaming industry, which is known to be historically affected by corruption, organized crime, influence, and a bunch of stuff that undermines the rule of law and faith in democracy, etc., etc. Bad, bad things associated with this particular industry, and so it's okay to look at that history, not just in Pennsylvania, but to know it exists wherever the gaming industry has touched down its finger, and say, we're just cutting that off. Why was the New Jersey Supreme Court just wrong to view this as a serious enough threat to warrant a broad prohibition? So, I put McCutcheon over there for purposes of answering your question. I think the next most important answer is the Gaming Act itself, for the reasons we've already covered this morning. The heavy scope of regulation in the Gaming Act does an immeasurably stronger job of protecting against the interests that you're articulating from Soto. Sure, and you can say, you know, we think this is good enough, but in New Jersey, the legislature thought, and the highest court of the state agreed, that you didn't have to just do some things that really drew out information about the background of individual actors. You could say, hey, this is an industry, this is a business line, which has been rife with problems, serious corruption problems, and we're just going to cut off the problem at the pass and say none, and that that, given the history of the problems, is not an inappropriate legislative response. What's wrong with that? Well, I don't want to pick on the state of New Jersey, but there was a specific history of organized crime in this industry in the 1970s and earlier in New Jersey, and that... Precisely, so let me just stop you right there. Are you saying that the Commonwealth of Pennsylvania, through its legislature, can't look at the experience of its neighboring state and say, that's a real problem, and guess what? They don't drive to the border of Pennsylvania and stop with their corruption. If there's corruption and there's gaming industry profits to be had, we should be worried about that, too. Well, they certainly didn't do that here. There's nothing in the record that says they did do that. They did not do that. I know, and I'm also not here to pick on the Commonwealth, because, as I've made clear, so much of this statute we think does achieve the aims that they're seeking to obtain. But they did not do what you just posited. In this record, let's just look at what actually happened here. To your question, Your Honor, along comes the original Section 1513, before 2009. Right, we're aware of the history. And the word large. Yeah. And the word large. Right, we're with you. We spent a lot of time with your case. Okay. So when you say they didn't do this here, the legislature, in fact, that's one of the arguments from the Commonwealth is, hey, you're holding the legislature to an inappropriate standard for their legislative fact-finding. I take their assertion to be the legislature can pay attention to what happens right next door. They can look at that. They don't have to say, I'm only thinking of Pennsylvania. They can look at what happened in New Jersey, and they can respond to that. And responding to that, they could legitimately respond to it the same way the New Jersey legislature did, as upheld by the New Jersey Supreme Court. Why can't they? But maybe you're not. Maybe I'm telling you what you've already thought of, but maybe I'm not. So give me 20 seconds to see if I am, and then I'll move to the next point on this. Because what they did before the amendment, before the General Assembly amended 1513, when the word large was in there, when the word large contributions, that's when, ostensibly, they were observing their neighbors. Their own Supreme Court, the Commonwealth's own Supreme Court, shot that down while looking at the New Jersey history. Then the General Assembly picked the statute back up. Back up. Picked it up. With no further record, no further exercise that the First Amendment requires them to do. They're required to do that. They have to do that. That's what the Supreme Court says. That's what this court says. That's what federal law says. Without any further exercise, they blue pencil the word large out. Judge Rambo takes what I think is a clever pot shot at them, but she's right, saying it's not just a typographical correction that the Constitution required them to do. So without a further examination, without saying, hey, we should look at what our neighbors did, because organized crime can drive across the border, just go across the water gap. That's all they have to do. Without doing that, they strike that word out and say, forget it. We're not just banning large contributions. We're banning everything. Now I'm taking McCutcheon out of the box. I'm going to take it out. I know you don't want me to do that, but that's where I got it. And we understand your argument on McCutcheon, I think, pretty thoroughly. So part of your argument is this was, in effect, done below, but if it had been done below, it wouldn't survive McCutcheon? I think that that's correct. But this would be a different beast if the range of people who got the contributions was narrower, if there were limits rather than bans. Would we be having the same argument here? If Pennsylvania came back and reenacted a statute that fewer people, more of an interest in casinos, some amount of money, just not large amounts of money, would that be permissible? I do think that we would be having a different argument. I'm unwilling to say that I think that I would be advocating for a different bottom line. I expect it would be an argument with many different permutations. Okay. Thank you very much, Mr. Hamel. Thank you. Mr. Hofkirk, you have reserved three minutes for rebuttal, sir. So the first thing I did want to address is the strict scrutiny aspect, which seems to be tied to this independent expenditure view of the statute. I've already told you what our position is, but if the court agrees with the other side on that, the court could strike down the statute to the extent it prohibits independent expenditures and save the rest of the statute. And is it possible then for us, implicit, I think, in your statement as a concession, but let me make sure, that it's not inappropriate to say, look, a part of this statute, if it reaches independent expenditures, is subject to strict scrutiny, but the rest of it would be subject to that intermediate scrutiny, modified intermediate scrutiny described in Buckley? That's correct. We disagree with the statutory interpretation, but yes. Sure. And I wanted to throw out, you had talked about the register of wills, that there's no way they could be affected or affect the gaming act. Hypothetical, a larger state involving interest in the gaming industry goes through the Philadelphia register of wills. It's possible that that would be affected. That's true. I mean, we could spin hypotheticals where it turns out that the cousin of the levy court commissioner is somebody who owns a substantial interest in a gaming thing. I mean, it's possible to come up with these, but doesn't that all fly in the face of the closely drawn demand? We're not attempting to cast the net so broadly that it cuts off every conceivable problem. It has to be closely drawn to meet the specific quid pro quo corruption or appearance problem. I understand your point. I'm just trying to say that the General Assembly in trying to craft the prohibition may involve we don't know where the whack-a-mole might come up, and so we just have to prepare for every contingency. Okay, understood. Do you disagree with your opponent's representation that there's nothing in the record here? There was nothing that the legislature drew on New Jersey's experience, Louisiana's experience. This legislation, whether it could have been supported, wasn't in fact supported by an evidentiary record. So the General Assembly in its record, in parts of which are included in the appendix, specifically discusses New Jersey and Louisiana. Can you direct us to what you think is the most helpful place in the appendix on that? I'm sorry. I'm not finding it. Okay. All right. Good night, Gordon. Nothing from you, I take it, sir? I have no more questions. Okay. All right. Well, let me thank you, Mr. Hopkirk and Mr. Hamill. We've got the case under advisement, and we will.